LAWRENCE CONSTANTINO *et al., Appellants,* v. JOSEPH V. MORESCHI *et al., Respondents.*[1]

*Mark M. Litchman,* for appellants.

*Vanderveer, Bassett & Geisness,* for respondents.

JEFFERS, J.—This is an appeal by plaintiffs, Lawrence Constantino and J. V. Sauro, president and secretary-treasurer, respectively, of Local 440, International Hod Carriers', Building and Common Laborers' Union, from

[1]Reported in 115 P. (2d) 955.

a judgment made and entered by the superior court for King county, dismissing the complaint, after a stipulation had been entered into and filed by counsel for the respective parties that the testimony and exhibits introduced at the hearing on the application for a restraining order would be the same as if the issues had been tried out on the merits.

International Hod Carriers', Building and Common Laborers' Union will hereinafter be referred to as the international.

Plaintiffs instituted this action in May, 1940, to restrain defendants, individually and collectively, from in any way interfering with the right of plaintiff Local 440, to supervise the furnishing of labor on the Mud Mountain dam, and to further restrain defendants from in any way compelling plaintiff local to affiliate with the Western Washington District Council, an association chartered by the international, and composed of various locals in western Washington.

The substance of the complaint, which sets up two purported causes of action, is that Joseph V. Moreschi, president of the international, is attempting to compel Local 440 to affiliate with the Western Washington District Council, which council, plaintiffs claim, was not formed in accordance with § 67 of the constitution and general rules of the international, which provides:

"Whenever two or more Local Unions are formed in any one city or adjoining cities within a territory of ten (10) miles, a District Council shall be formed upon application to the office of the General Secretary-Treasurer for a charter, . . ."

and that President Moreschi is attempting to compel plaintiff local to pay a monthly per capita tax and other forms of assessment to maintain a business agent, appointed by the general president. It is further set out in the complaint that such action would entail the surrender of local sovereignty, and would

deprive Local 440 of its rights relative to policing the Mud Mountain dam project. It is further alleged that plaintiff local has refused to comply with the order of President Moreschi, and that there is immediate danger that President Moreschi or his agents will seize the property and affairs of plaintiff local, to the irreparable damage of its membership.

In order to get the picture presented by this controversy, it will be necessary to set out quite fully the facts as shown by the testimony and documentary evidence.

Around the holidays of 1936, plaintiff union, represented by one Louis Natelli, a member thereof, together with representatives from locals in Aberdeen, Everett, Centralia, Bremerton, and Yakima, applied to the international, to grant them a charter for a district council in western Washington and Yakima. In this application, the locals, through their representatives, pledged themselves, individually and collectively, to be governed by the constitution, by-laws, and rules of the international, and requested that the seat of the council be in Tacoma.

Pursuant to this application, a charter was issued on January 3, 1937, marked "Western Washington and Yakima." Apparently because of a desire to limit the jurisdiction of the council to western Washington, this original charter was surrendered and a new charter issued September 3, 1938, eliminating Yakima. This last charter was not forwarded to the council until December 13, 1939. The letter which accompanied this charter, and which was signed by Mr. Moreschi, stated in part:

"I am forwarding to you today charter and seal for the Western Washington District Council. You will note, therefore, that I approve of the use of the said title by your Council instead of the 'District Council of the Greater Metropolitan Area of Seattle, Washing-

ton and Vicinity.' This is in accordance with the request of your Council for the title 'Western Washington District Council.'"

From the record, it would appear that the delay in sending this second charter was due to the fact that, until September 16, 1939, the council was undecided about the change in name. On this date the following appears from the minutes of the council meeting, held in Tacoma:

"For convenient and practical reasons the delegates felt that it is better to continue under the name of the Western Washington District Council rather than long name submitted by the International Union. A motion prevailed to this effect and that the International Union be advised accordingly."

On September 10, 1938, the council adopted a constitution and set of by-laws, which were approved by the international on October 3, 1938. The purpose of forming the council, as expressed in the preamble, was to create a more efficacious agency for collective bargaining and for the adjustment of disputes between the members and employers, to create a better understanding of the aims of labor, and to coordinate the local unions and rearrange their relations to harmonize their ideals with efficient action. This purpose is set out in § 1, of article 2, of the instrument, as follows:

"The objects of this district council shall be the establishment of a central representative body for the local unions within its jurisdiction to:

"(1) negotiate, bargain for and enter into understandings and agreements with employers, and to police the observance by employees and employers of existing understandings and agreements and to adjust disputes arising between the members and employers."

Article 4, which defines the powers of the council, provides:

"Section 1. This council shall have executive, legislative and disciplinary power to: . . .

"(2) determine and levy a tax on all its affiliated local unions to defray the necessary expenses of the council;

"(3) make and police the observance of agreements with employers, and adjust disputes arising between employers and members; . . .

"Section 4. The council shall carry out and enforce the constitution and laws of the International Union and all mandates of the International Executive Board and the General President and General Secretary-Treasurer."

Article 13 provides in part as follows:

"Section 1. This District Council, the officers or members thereof, and members or locals affiliated with the Council shall not resort to any court, whether in law or equity, in any matter involving a question arising out of his or its membership in this Council, in the International Hod Carriers' Building and Common Laborers' Union or in any Local affiliated with this Council until and unless he or it has first exhausted the remedies prescribed by the constitution, rules and practices of the International and the constitution and by-laws of the Council and the constitution and by-laws of the respective local."

Article 15 of the constitution of plaintiff local provides:

"This Local shall affiliate with and elect delegates to Central Bodies, Building Trades Councils and State Federations of Labor chartered by the American Federation of Labor and with District Councils of our International if any exist in the vicinity, or in the jurisdiction of this Local."

Section 73 of the constitution and general rules of the international provides:

"Any union of this I. U., within the jurisdiction of the District Council, after being notified that a District Council is formed, shall affiliate with said District

Council, as provided for by the Constitution and general rules of the International Union."

Section 71 of the international constitution provides in part:

"The District Council shall have jurisdiction, supervision and control over all matters relative to agreements with employers in their locality concerning wages, hours, and working conditions; and of all things necessary to guard the interests of locals under its jurisdiction."

Section 18 of the international constitution gives the general president power to decide all questions of order, law and usages, and all constitutional questions, subject to an appeal to the union; to visit subordinate unions and inspect their proceedings, either personally or by deputy, whenever the necessities of the case demand it; and require a compliance with the laws, rules, and usages of the union. He is given general supervision of the interests of the union as the supreme executive officer. He is also given power to investigate, or deputize other persons to investigate, any grievance which may arise in any local union, or the misconduct of the officers of any local union, and to demand that all books, receipts, and any other paper pertaining to the local be turned over to him or any person authorized by him. The general president and the general secretary-treasurer are vested with authority over, and to enter into, national, regional, or area agreements with employers or employer associations. The general president, subject to the review of the executive board, is given full authority to enforce observance of such agreements and other lawful orders.

Section 22 of the same constitution provides:

"The Executive Board shall have the entire control of all judicial business of this Union, when not in session, viz., all appeals by members of Unions against each other; all decisions as to the law or usage of the

Hod Carriers' Building and Common Laborers' International Union of America; all charges or disputes of one member against another or his Union, and all charges or disputes of one Union against another and all questions as to the law raised or reported by deputies. In fact, all questions relating to laws of International Union, and their decisions shall be final (unless reversed by the International Union in Convention assembled) and must be respected and obeyed accordingly."

Local 440, in so far as this record shows, was represented at, and took part in, the meetings of the council, from the time it was formed until sometime after the meeting of August, 1939. Fred Mason, a member of Local 440, was president of the council from October, 1938, to August, 1939.

It appears from the minutes of the meeting of the council of June 17, 1939, that President Moreschi was present at this meeting, and participated therein, finally submitting to the council the following question: "Do you want the International to sign an agreement for you on heavy construction?" Local 440 was represented at this meeting, and voted "Yes" on the above question. Plaintiff J. V. Sauro, of Local 440, was also present at this meeting, and made a report.

The minutes of the council meeting of July 22, 1939, show that Local 440 was represented by Louis Natelli, one of the men who applied to the international for a district council charter. Mr. Natelli made a report at this meeting. A letter from President Moreschi, relative to the appointment of W. G. Blake as business representative of the council, was read, and after considerable discussion the matter was referred to the affiliated locals, with a request that they vote on it and advise the secretary of the vote taken.

The minutes of the council meeting of August 19, 1939, show that Louis Natelli was present, represent-

ing Local 440. A vote was taken at this meeting on the proposition submitted by President Moreschi at the July meeting, relative to Blake's appointment as business representative of the council, and Fred Mason, Louis Natelli, and J. V. Sauro, representing Local 440, voted "No." The proposition, however, carried by a vote of fourteen to twelve.

It does not appear that Local 440 paid any dues or assessments, or participated in any council meeting, after the August meeting above referred to.

At about this time, the Guy Atkinson Company entered into a written agreement with the Seattle Building and Construction Trades Council and the Tacoma Building and Construction Trades Council, relative to the employment of labor on Mud Mountain dam. Under this agreement the employer agreed to employ only members in good standing of the unions represented by the signers thereof, and the unions agreed to furnish all labor necessary for the performance of the contract. The agreement also provided that the unions would select a single contact man, to take up with the contractor all grievances or disputes arising on the job, and in the event any such dispute could not be satisfactorily adjusted, it was to be referred to an arbitration board, whose decision was to be final.

On August 29, 1939, which was shortly after the above agreement had been entered into, Local 440 and Local 242 of Seattle, and Local 252 of Tacoma, entered into an agreement relative to Mud Mountain dam, wherein it was agreed that the building and construction of camps and buildings should be the work of Local 242 exclusively, and that the men on the balance of the work, other than camps and buildings, should be dispatched on a fifty-fifty basis, between Local 440 and Local 252 of Tacoma. This agreement further provided

" . . . that the policing of both tunnels shall be done by Local 440 of Seattle, and all other policing other than tunnels shall be done by Local 252 of Tacoma."

At the council meeting of October 21, 1939, that body instructed its secretary to send the following telegram to J. V. Sauro, of Local 440:

"The District Council has assumed jurisdiction over work on Stevens Pass. Romano contractor has a signed union agreement with this Council and no local union is permitted to call a strike in this area without the sanction of the District Council Representative W. G. Blake."

On November 20, 1939, Mr. Moreschi, general president, wrote a letter to all local unions affiliated with the Western Washington District Council, relative to the nonpayment of dues, notifying them that such dues must be paid on or before November 30, 1939.

On December 29, 1939, President Moreschi wrote a letter to J. V. Sauro, secretary of Local 440, to the effect that he had been advised by the council that Local 440 had not complied with his letter of November 20th, and notifying the local that, under § 67 of the international constitution, it must maintain its affiliation with the council, and that it must adjust its differences with the council.

In reply to the above letter, Mr. Sauro, on January 11, 1940, wrote a letter on behalf of Local 440 to Mr. Moreschi, in which he stated that Local 440 did not believe that the Western Washington District Council was upholding the principles of the trades union movement, and that therefore Local 440 was severing connection with the council. In the letter, Mr. Sauro also called attention to § 67 of the international constitution, hereinbefore referred to.

On January 29, 1940, President Moreschi wrote another letter to Mr. Sauro, advising him that the matter

referred to in Mr. Sauro's letter of January 11th would be referred to the executive board of the international, at its coming meeting in Washington, D. C., in February.

On January 12, 1940, the secretary of the executive board wrote Mr. Sauro that President Moreschi would include in his report to the executive board the matter of the refusal of Local 440 to follow the instructions of Mr. Moreschi in his letters of November 20, 1939, and December 29, 1939, and advised the local that if they deemed it advisable they could have a representative appear before the executive board at that time.

On February 6, 1940, Locals 440, 242, and 457 of Seattle wrote a letter to the executive board, which states in part:

"We are unable to send a representative to your executive board meeting in Washington, D. C., February 12, 1940; but we feel that, as this dispute is in this locality, it is only fair that a hearing on this matter should be held here and not on the eastern seaboard."

On March 13, 1940, the secretary of the executive board wrote the following letter to the secretary of Local 440:

"This is to advise your local union that the Executive Board of this International Union at its executive session held February 13-24, 1940 inclusive at the Hamilton Hotel in Washington, D. C., and in New York, N. Y., took the following action:

" 'WESTERN WASHINGTON DISTRICT COUNCIL AND LOCALS 242, 440, and 457, SEATTLE, WASH.

" 'In the matter of Locals 242, 440 and 457, of Seattle, Washington, the Locals having been ordered, under date of December 29, 1939, to affiliate with the Western Washington District Council, and the said Locals having failed to carry out this order, and having been notified to appear at this hearing and not having appeared, it is

" 'VOTED: that Local 440 and Local 242 and Local 457, all of Seattle, Washington, be directed to comply with the above order within thirty (30) days from the date of the notice of this order and if at the end of such period, the said Locals have not complied, then the General President shall, within a reasonable time thereafter, take supervision, in accordance with the provisions of the International constitution, and it is

" 'FURTHER VOTED: that the General President and General Secretary-Treasurer make all necessary arrangements for entering into agreement with contractors or contractors' associations covering heavy construction in the Northwest Washington area, and consummate same in accordance with the provisions of the general constitution.'

"You will please note that affiliation with the District Council must be accomplished within thirty days from the date of this notice. Please acknowledge receipt of this letter and notify me again as soon as your local has affiliated with the Western Washington District Council."

On April 9, 1940, Mr. Mark M. Litchman, in answer to a question propounded to him by plaintiff local, wrote the local and the international, to the effect that the international executive board did not have the power to compel Local 440 to affiliate with a district council whose locals embrace territory more than ten miles distant from Seattle, nor did it have the power to compel the membership to pay a per capita tax and initiation fees, nor did it have the power, upon the failure of the local so to do, to take over the sovereignty of the local.

On April 23, 1940, both the Seattle and Tacoma Building and Construction Trades Councils requested the Western Washington District Council of laborers to take over supervision of the Mud Mountain dam project temporarily, in so far as the Hod Carriers, Building and Common Laborers were concerned, which

the council did, through its business representative, on April 27, 1940.

On May 13, 1940, President Moreschi having reported to the executive board the refusal of Local 440 to comply with the order of the board, the executive board passed a resolution requiring Local 440 to show cause before the general president, on Tuesday, May 28, 1940, at 7:30 p. m., Wednesday, May 29, 1940, at 7:30 p. m., and on Friday, May 31, 1940, at 7:30 p. m., at the Olympic hotel, Seattle, why the officers and members of the local had not complied with the order of the general president and with the order of the executive board, and, further, to show cause why the general president should not take supervision of the local union, by reason of its failure to comply with the orders referred to. A copy of this resolution was sent to Local 440 on May 17, 1940.

Pursuant to the above order, Mr. Litchman, together with certain representatives of plaintiff local, called on Mr. Moreschi, at the Olympic hotel, and requested that Mr. Litchman be permitted to sit in and take part in the conference. Mr. Moreschi declined to permit Mr. Litchman to sit in the conference, for the reason, as stated by him, that "it is not our policy to let outsiders sit in on union affairs," whereupon Mr. Litchman and the representatives of Local 440 left and did not participate in the conference.

This proceeding had been started on May 7, 1940, which was subsequent to the order of the executive board of February 13, 1940, but prior to the date of the last conference.

The trial court rendered judgment as hereinbefore indicated, and this appeal by plaintiff followed.

The assignments of error are:

"(1) The court erred in holding that the obvious meaning of the word, 'city,' 'adjoining cities,' and 'within a territory of ten miles,' can be deleted or ex-

panded by an international executive to serve his own purposes so as to compel a Seattle local to join a district council composed of cities more than ten miles distant from it.

"(2) We will not mention the other errors since they all flow from Moreschi's abuse of the legislative power. For example: The court erred in holding that this charterless organization, during the time that the Seattle local was associated with it, had a legal existence. Another error was in holding that this charterless association was anything more than a contact group for the various locals in the western part of the state."

As we understand appellant's first contention, it is that respondents are seeking to compel Local 440 to affiliate with the Western Washington District Council, and pay the dues and fees required of it by the council, and that, because of its failure so to do, the property and affairs of the local are about to be taken over by the general president. It is further contended that respondents have no right to do this, as the council was illegally formed, since it does not comply with the requirements of § 67 of the international constitution, in that it includes within its membership locals not in the same city, and not in adjoining cities within a territory of ten miles. Appellants then, in their brief, discuss § 67, particularly as regards the meaning of the words "city," "adjoining cities," "within a territory," and "ten miles," further discussing the rule that "where a constitution is clear there is no room for construction," and the rules relative to practical construction and ratification.

We are clearly of the opinion that there is no attempt here on the part of respondents to compel appellant local to affiliate with the council. Local 440 has, in our opinion, been an affiliate from the beginning, by whatever name the council may have been called. There has never been but one council. It has operated

under the same constitution and by-laws which were approved by the international. It was not a charter-less association, as claimed by appellants, but was organized under a charter, and recognized by the international as so operating. The fact that there was a change in the name had no legal effect, in so far as appellants were concerned, under the facts in this case; nor would the delay in sending forward the last charter, due to the inability of the council to decide on a change of name, have any legal effect.

What appellant local is here attempting to do is to withdraw from the council, because it claims it is dissatisfied with what the council is doing; and what respondents are attempting to do is to compel Local 440 to comply with the constitution and by-laws of the council, the international, and Local 440, and pay its dues and assessments.

We now come to a discussion of § 67 of the international constitution, upon which appellants very largely rely for their contention that no legal council was ever formed, that Local 440 was never in a legally formed council, and therefore it never was under the jurisdiction of a council, and was and is entitled to contract as it did relative to Mud Mountain dam.

While the uncontradicted testimony in this case shows that the executive board of the international had, for a number of years prior to the application of appellant local for a charter, been chartering councils embracing territory as large as a county, and even as large as a state, thus plainly indicating the construction placed by the executive board upon § 67 of the constitution, and while respondents have cited authority to the effect that, where the officers of such an unincorporated association have placed an interpretation upon its constitution or by-laws, the courts generally will not interfere therewith, we are of the opinion that

it makes no difference in this case what interpretation the executive board may have placed on § 67, other than that such interpretation was known to appellant local at the time it petitioned for a council charter. We are not here called upon to decide, and we do not decide in this case, whether or not the executive board, purporting to act pursuant to its constitution, could compel a local to affiliate with a council not formed in strict accordance with § 67. Neither are we called upon to decide whether or not the construction placed upon § 67 by the executive board amounts to legislation rather than construction.

We are only called upon to pass upon the question of whether or not Local 440, knowing, as it must be presumed to have known, of the provisions of § 67, and knowing the interpretation placed thereon by the executive board, yet nevertheless voluntarily petitioning the international for a council charter, such petition being joined in by locals not in the same city and not in adjoining cities within a territory of ten miles, and after participating in the affairs of a council formed pursuant to such petition, can now withdraw from such council, for the claimed reason that such council was not formed in accordance with § 67.

We are clearly of the opinion that, under the facts in this case and the law applicable thereto, the locals joining in the application for a council charter have waived their right to now claim that the council was not formed strictly in accordance with § 67.

Waiver is defined in the Restatement of the Law of Contracts, 440, § 297, comment b, as "the voluntary relinquishment of a known right."

In 67 C. J. 299, § 3, we find the following statement:

"To constitute waiver there must be, generally, first, an existing right, benefit, or advantage; secondly,

knowledge, actual or constructive, of the existence of such right, benefit, or advantage; and, lastly, an actual intention to relinquish it, or such conduct as warrants an inference of relinquishment."

We believe all of the essentials are present in the instant case, as shown by the facts hereinbefore set out.

The principle upon which our conclusion is based is supported by the recent case of *Beaulaurier v. Washington State Hop Producers,* 8 Wn. (2d) 79, 111 P. (2d) 559. See, also, *California Raisin Growers' Ass'n v. Abbott,* 160 Cal. 601, 117 Pac. 767.

Holding as we do that appellant local is and has been a member of the Western Washington District Council, and as such member is amenable to its constitution and by-laws, and to the constitution and by-laws of the international, Local 440 is not entitled to apply to the courts for relief, for the reason that it has not exhausted the remedy provided by its own organization. The facts in this case do not bring appellant local within the exception noted in *Local Lodge No. 104 etc. v. International Brotherhood etc.,* 158 Wash. 480, 291 Pac. 328.

There is no question but that, under article 10 of the constitution and by-laws of the council, Local 440 could and should have presented to the executive board of the council any grievance it may have had against the council, and that, if it felt aggrieved by the action of the trial board, it should then have taken an appeal to the executive board of the international. Neither is there any question but that, if appellant local felt aggrieved by any order or decision of the international president, it could have had such order or decision reviewed by the executive board of the international. Appellant local failed and refused to exhaust either of these remedies, after two opportunities were af-

forded it to appear before the executive council of the international.

Clearly, under article 13 of the constitution and by-laws of the council, appellant local is prohibited from resorting to any court of law or equity, until and unless it has first exhausted the remedies provided by the constitution, rules and practice of the international, the constitution and by-laws of the council, and the constitution and by-laws of the local. In this connection, we desire to refer to the early case of *Herman v. Plummer*, 20 Wash. 363, 55 Pac. 315.

We have examined the authorities cited by appellants under the headings, "The Law on Meaning of Words," "The Definition of a City," "The Meaning of the Word 'Adjoining'," "Where the Constitution is Clear, There is no Room for Construction," and "There Can Be no Ratification of a Violation of a Constitution," and while we do not disagree with the authority cited, it becomes inapplicable here mainly because of our conclusion that the doctrine of waiver applies herein.

For the reasons here assigned, the judgment of the trial court is affirmed.

ROBINSON, C. J., BEALS, MILLARD, and SIMPSON, JJ., concur.